(No. 31198.—

C. C. DREMAN, County Judge, Appellee, *vs.* LUCILLE FIELDS *et al.,* Appellants.

*Opinion filed May 18, 1950.*

WILLIAM P. FLEMING, EDWARD F. O'MALLEY, LOUIS F. ORR, ROBERT B. RUTLEDGE, and R. E. COSTELLO, all of East St. Louis, for appellants.

PHILIP G. LISTEMAN, of East St. Louis, (LLOYD MIDDLETON, and JAMES H. BANDY, of counsel,) for appellee.

Mr. JUSTICE DAILY delivered the opinion of the court:.

The appellants, Lucille Fields, Joseph L. Sharp, Mary E. Spires, Margaret Carpenter and Mamie Lusk, who were judges and clerks at the primary election held on April 13, 1948, in St. Clair County, appealed to the Appellate Court, Fourth District, from an order of the county court of St. Clair County finding them guilty of contempt and imposing jail sentences upon each of them and removing them from their offices. The Appellate Court affirmed the order of the county court and we have granted appellants leave to appeal. They will be hereinafter referred to as respondents.

The respondents were judges and clerks of precinct number 12 in East St. Louis, and served in such capacities for the primary election held on April 13, 1948. It appears that they had all served previously as election officials, and that prior to this particular election the county judge had conducted a class of instruction for poll officials at the election commissioners' office in East St. Louis, and that all of these individuals, except Joseph L. Sharp, had attended said class and were furnished with pamphlets explaining the duties and obligations of their respective offices.

On the day before the election, a pollbook, applications for ballots and other election materials were delivered to the precinct and were receipted for by the respondent

Lucille Fields. There were 300 Republican and 300 Democratic ballots, in all, delivered to the precinct. The respondents admittedly served in the capacity of judges and clerks at the election, and after the closing of the polls it appears that they proceeded with the counting of the ballots, the tabulation of the votes and other duties of their offices. At about 10:00 A.M. on the following morning, to-wit: April 14, 1948, they returned the sealed ballot sacks, applications for ballots, tally sheets, statement of votes and other election supplies to the election office.

The statement of votes prepared by respondents and signed by them represented that 300 Republican ballots and 193 Democratic ballots had been cast, while the applications for ballots showed that there were only 147 applications for Republican ballots and one absentee Republican ballot. It also appeared that for the office of county auditor on the Democratic ticket, one candidate had been credited with 181 votes and her opponent had been given 34 votes, making a total of 215 votes in all, which was more than the total Democratic ballots cast. Likewise the report of votes for various offices on the Republican ballot indicated more votes cast than applications for ballots. It also appeared that 96 Republican ballots were marked but were uninitialed and had been folded but once and could not have been inserted into the ballot box by a voter.

The county judge of St. Clair County, under the provisions of section 7-30 of the Election Code, (Ill. Rev. Stat. 1947, chap. 46, par. 7-30,) issued a citation against the respondents requiring them to appear in the county court and show cause why they should not be held in contempt of court. This citation was issued on April 15, 1948, and was made returnable on April 23, 1948. The respondents appeared on that day with their five lawyers and requested an order for filing a specification of charges against them. A written specification of charges was filed on April 24, 1948. A motion to dismiss such specification of charges

was argued and overruled and then the respondents filed a verified answer denying any misconduct. A hearing was held before the court, at which the applications for ballots, statement of votes, tally sheets, pollbooks, oaths of office and other election material of the precinct were all introduced in evidence. The sealed ballot sacks were opened and the ballots were examined and counted in open court in the presence of the respondents and their counsel. The irregularities above cited were verified, as were other numerous irregularities which, for purposes of this opinion, are not necessary to enumerate.

At the close of the hearing, the court, in a written finding, held the respondents guilty of contempt and imposed jail sentences upon the judges, Lucille Fields, Joseph L. Sharp and Mary E. Spires, of six months each; and upon the clerks, Margaret Carpenter and Mamie Lusk, of three months each. · The court also ordered the respondents to pay the costs of the proceeding and denied them payment for serving as judges and clerks at the election.

The respondents contend that the portion of the election law under which they were punished is invalid, and that they were denied due process of law, and that they were charged with a crime but were tried in a civil proceeding. They also contend that there was not sufficient evidence, as a matter of law, to sustain the judgment of the trial court.

The question of the validity of the statute cannot be raised in this court at this time because the respondents took their appeal to the Appellate Court and thereby waived their right to attack the validity of the statute. (*People* v. *Richardson,* 397 Ill. 84.) It is also apparent that the validity of the statute was not raised in the trial court and, therefore, it could not be raised on appeal. (*Jenisek* v. *Riggs,* 381 Ill. 290.) The contention that respondents were denied due process of law likewise is without merit because this court, in several similar cases, has disposed of conten-

tions identical to those made here. (*People ex rel. Rusch,* v. *Ladwig,* 365 Ill. 574; *Sherman* v. *People,* 210 Ill. 552.) It has likewise been held that the mere fact that respondents' misbehavior may have constituted a violation of a criminal statute is no bar to punishment for contempt. *Sherman* v. *People,* 210 Ill. 552.

The sole questions, then, left for consideration are those regarding the sufficiency of the evidence to sustain the judgment of the trial court and the possible excessiveness of the punishment. It appears that the election precinct where respondents served is predominantly colored in voting population, and that the four women election officers are colored, while Sharp is a white man. The polling place was in a room at the residence of Mamie Lusk, one of the clerks, which was a double tenant home of but three or four rooms, without modern sanitary facilities. The voting room was described by a witness as being about 12 feet by 14 feet, and was furnished with tables, chairs and a davenette. The door to the outside was located three or four feet from the voting table. One Paul Anderson, who testified, stated that at least twice during the election day the room became so crowded that others desiring to vote could not get in. He further stated that a large number of persons, both colored and white, who were not voters, came in and out of the polling place during the day and that about twelve or fifteen persons, including some candidates who wished to see how the vote was going, remained in the room after the polls closed. This witness also was in and out of the room several times during the night and found the judges and clerks counting votes on each occasion. He stated that sometime in the early morning hours, while the count was proceding, four unknown white men entered the room, looked around, asked questions and then left, after which two of the men returned and started to pick up articles from the judges' table, and that one said to the other, "Here put that in your pocket,"

whereupon the other took something from the table and put it in his pocket. Anderson said that when Lucille Fields asked them who they were, one said he was a "candidate from the election commissioner's office." Mrs. Fields then asked the witness to summon the police, which he did, but the officers who answered the call could find no trace of the men, who had been seen leaving in a car.

The witness told further of how a man named Roberts, a candidate at the election, had come to the polling place, and after telling those present that he had a deputy sheriff with him, profanely asked what was going on and stated: "If you don't know what Sing Sing looks like I am going to see that you get there, you are not going to jail here either, you are going up to the. post office." After this occurred one of the women officials became sick and left the room to lie down, while another one exclaimed, "I never saw such a mess. I don't know whether I am coming or going." He said that all the judges and clerks appeared tired and exhausted.

Two police officers testified that in response to a call they went to the polling place at about six o'clock on the morning following election day, and were given information about the men coming in and disarranging the ballots and election supplies. They said that they made a search of the neighborhood but could not find the men.

Thomas Hennessey, one of the members of the board of election commissioners, testified that he went to the premises about five o'clock the same morning with one of his deputies, and at that time he met two white men who did not give him credentials on his request. He returned at six o'clock with a different deputy and was at the place when the police arrived. He again left, leaving his deputy to watch the polls, and later returned with Fred Pierce, another member of the commission. Hennessey stated that the judges were told that they would have to recount the ballots, which they started to do, but after the third or

fourth tally sheet was reached, Pierce called him outside and suggested it would be a good idea for the judges and clerks to finish up their work and bring everything to the election office. The entire group left the polling place about ten o'clock in the morning and went to the office of the commission.

Mead Dowling, chairman of the commission, testified he was present at the office when the ballots and returns were brought in. He stated they were "in a muddle" and could not be checked, so he ordered them put in a ballot box and stored in a vault.

Respondents did not testify at the hearing, declining on the ground that their testimony might have the effect of depriving them of their constitutional rights, inasmuch as a criminal proceeding growing out of the same matter was then pending against them. Proof was presented as to their good character, and it was also established that the women were housewives, two of them having several children each.

At the hearing before the county judge, the tally sheets introduced in evidence showed votes for candidates greatly in excess of the number of persons shown to have voted at the precinct. It was also shown that numerous uninitialed ballots were deposited in the ballot box. On the record made, this alone was sufficient to justify the county judge in finding respondents guilty of contempt as officers of the court. However, the unusual disturbances, confusion and interference which prevailed when the judges should have been free to count the ballots, and the resultant multiple handling of tally sheets both by interlopers and others legally present, raises serious doubt as to whether the contempt with which respondents are charged was, in its entirety, the complete result of their own voluntary acts. The proper procedure to be followed in counting ballots and filling out tally sheets, after the polls close in a precinct, would be for the doors to the polling place to be closed and locked to all

except the election officials and checkers of the political parties. Certainly utter strangers and those lacking credentials should be locked out at all times during the count. Why this procedure was not followed in the present case, or if dereliction of the respondents was the primary cause of the confused procedure, we can only surmise. From the evidence it appears that the polling place was inadequate and insecure for the needs of the precinct. Respondents appear to have been persons who had not the ability, without police protection, to keep interlopers from the place or to prevent interference with the records they were keeping. The threat to imprison respondents was highly irregular conduct, to which they should not have been subjected, and which, as the evidence shows, served only to disrupt and unnerve respondents to a greater extent.

The record thus presents evidence of dominance, intimidation and inability, which creates a situation different from that which is generally before a court in an election contempt case. At the same time, however, there is some showing of contemptuous mishandling of ballots and records which could only have resulted from the voluntary acts of respondents, for which they should not go unpunished. The uncontrolled disturbances, threats and interference occurring at the polling place during the night were such as would alleviate some of respondents' acts even though such incidents did not legally excuse them. We are of the opinion that respondents, who were compelled to work in such poor and insecure surroundings and with fewer facilities at their command than others doing the same work, should not have the most severe punishment of imprisonment inflicted upon them.

The judgment of the Appellate Court affirming the order of the county court insofar as it finds respondents in contempt, removes them from office and withholds their pay, is affirmed, but so much of said order as fixes their punishment at imprisonment is reversed, and the cause is

remanded to the county court with directions that the court fix and impose a fine of three hundred ($300.00) dollars each on Lucille Fields, Joseph L. Sharp and Mary E. Spires, the election judges, and a fine of one hundred ($100.00) dollars each on Margaret Carpenter and Mamie Lusk, the election clerks, all respondents to share the cost of this proceeding.

*Affirmed in part, reversed in part*
*and remanded with directions.*